IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| **JACOB DOE,** | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | )    Case No. 7:19cv249 |
| | ) |
| **VIRGINIA POLYTECHNIC INSTITUTE** | ) |
| **AND STATE UNIVERSITY, et al.,** | ) |
| | ) |
|    Defendants. | ) |
| | ) |

**DEFENDANT'S RESPONSE IN OPPOSITION
TO MOTION TO EXCLUDE PETER LAKE**

Defendant Virginia Polytechnic Institute and State University ("Virginia Tech"), by counsel, submits this Response in Opposition to plaintiff's Motion in Limine to Exclude Virginia Tech's retained expert, Peter Lake, ECF No. 77. As set forth more fully below, Jacob Doe's ("Doe") motion should be denied.

### STATEMENT OF THE CASE

In this case, Doe contends that Virginia Tech erroneously suspended him for a violation of Virginia Tech's Student Code of Conduct. By Memorandum Opinion and an accompanying Order, the Court dismissed all of Doe's claims except for his claim brought pursuant to Title IX of the Education Amendments Act of 1972, in which Doe claims his alleged erroneous suspension was motivated by gender bias.

In his Complaint, Doe makes various allegations about Virginia Tech's Title IX and Student Conduct policies and procedures that he claims are biased against men and further alleges that Virginia Tech's application of those policies and procedures in his case produced an "erroneous outcome" that was motivated by gender bias. In response,



- 1 -

Virginia Tech retained Peter Lake ("Lake"), a recognized authority on Title IX compliance, to address in essence the standard of care with respect to university policies, procedures, and training in the realm of Title IX. Doe objects to Lake's opinions and claims Lake's opinions are impermissible legal conclusions that would run the risk of confusing the jury. Doe's objection does not hold water, and Lake should be permitted to testify in this matter.

### ARGUMENT & AUTHORITY

**I. Standard of Review**

Federal Rule of Evidence 702 governs the admissibility of expert testimony and "'was intended to liberalize the introduction of relevant expert evidence.'" Bobardiere v. Schlumberger Tech. Corp., 934 F. Supp. 2d 843, 845 (N.D.W. Va. 2013) (quoting Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999)). Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The Supreme Court's decisions in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589–90 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141–42 (1999) provide the backbone for evaluation of proffered scientific expert testimony. Kumho Tire extended the rule set forth in Daubert such that all expert testimony must be


FRITH ANDERSON +PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

both relevant and reliable. 526 U.S. at 141. It is the district court's role to act as a gatekeeper to determine whether an expert witness is qualified and whether expert opinion is reliable. Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001).

Where, as here, the expert offers not scientific expert testimony but other specialized knowledge, the test is "somewhat more opaque," and the court need only be satisfied that the expert's experience "leads to the conclusions reached . . . is a sufficient basis for the opinion, and . . . is reliably applied to the facts." United States v. Wilson, 484 F.3d 267, 274 (4th Cir. 2007). Thus, in such circumstances, the Daubert factors governing reliability "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Kumho Tire, 526 U.S. at 150; United States v. Crisp, 324 F.3d 261, 266 (4th Cir. 2003) ("Daubert's five factors neither necessarily nor exclusively apply to every expert.").

"The question of whether a witness is qualified to testify is context-driven and can only be determined by the nature of the opinion he offers." RG Steel Sparrows Point, LLC v. Kinder Morgan Bulk Terminals, 609 F. App'x 731, 738 (4th Cir. 2015). Notably, "[a] review of the case law after Daubert shows that the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Adv. Comm. Notes, 2000 Amends. Indeed, "[t]estimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993).

## II. The Context of Doe's Claims

In this case, Doe alleges that he was erroneously found responsible for violating Virginia Tech's Student Code of Conduct and that erroneous finding was "motivated" by



629.0344\NHS
4848-2093-8235 .v1

gender bias. ECF No. 1, ¶ 91. That gender bias, according to Doe, includes "the initial failure to investigate Doe's complaint against Roe" and the "grossly disproportionate findings and sanctions . . . against Doe." ECF No. 77, *1.

In addition, however, Doe contends that Virginia Tech's decision was steered by "archaic stereotypes about the roles of men and women in relationships" and "unsupported presumptions about the credibility of the parties." ECF No. 1, ¶¶ 73–74. Doe claims the investigation process was not "fair and thorough." Id., ¶ 73. Doe claims Virginia Tech "failed to take [Doe's] charges [against Roe] serious, operating from the presumption that only the female complainant could be a victim." Id., ¶ 75. He maintains that Virginia Tech "failed to provide [him] with the same victim rights and support as provided to Roe." Id., ¶ 77. Doe alleges that Virginia Tech's "process . . . plainly favors female students over male students, not just one that favors complainants over respondents." Id., ¶ 86. He contends that Virginia Tech "treats male students accused of sexual misconduct by female students more aggressively than it otherwise would, and more aggressively than it would treat similar complaints made by male students against female students" due to investigations at other schools by the Department of Education's Office for Civil Rights. Id., ¶ 87. Doe also claims that the appeals process at Virginia Tech "disproportionately and negatively affects male students." Id., ¶ 89.

During discovery, Doe spent a substantial amount of time questioning witnesses in this case about trauma-informed practices and trainings, insinuating those practices are representative of gender bias and even going so far as to ask two witnesses whether they "believed" Christine Blasey-Ford's allegations against Supreme Court Justice Brett Kavanaugh. See Oaks Dep., 98:20–100:25; McCrery Dep., 70:2–73:3, 42:7–44:3; Polidoro

- 4 -

Dep., 104:13–108:3, 126:22–128:12; Settle Dep., 28:4–30:11; Rose Dep., 59:15–77:13; Lake Dep., 66:2–78:20.

So, Doe has made this case about more than just Virginia Tech's alleged "failure to investigate Doe's complaint" and "grossly disproportionate findings and sanctions." Doe's Complaint indicts the entire Virginia Tech process for Title IX investigations and Student Conduct proceedings and insinuates that Virginia Tech staff charged with applying and enforcing those policies are ingrained with "archaic stereotypes" as a result of their training.

### III. **Lake's Opinions**

Rather than focusing on the details of Lake's report, Doe lobs his attack on the two queries identified by Lake in his report:

> (1) whether or not Virginia Tech's Title IX and Student Conduct Policies are facially discriminatory based on sex in violation of Title IX, and (2) whether or not Virginia Tech's application of those policies in the specific Title IX investigation and student conduct proceeding at issue in this case demonstrated any discrimination based on sex.

Lake Report, *5. But the underlying opinions are the true heart of the matter for purposes of the instant motion.

For example, Lake makes the following observations and statements in his report that are reliable and will be helpful to the jury:

➢ In forming my opinions in response to query (1), I have assessed Virginia Tech's policies and procedures *in light of applicable objective standards for assessing recipient compliance with Title IX.*

➢ I observe at the outset that Title IX contains no specific requirements for institutional recipient policies related to Title IX compliance other than this mandate.



629.0344\NHS
4848-2093-8235 .v1

- ➢ There is nothing in the information that I have reviewed that indicates or demonstrates that Virginia Tech policies or procedures facially conflict with Title IX's statutory mandate.

- ➢ No feature of any of the policies or procedures documents I have reviewed facially excludes a person in the United States from participation in any education program or activity at Virginia Tech (or elsewhere) on the basis of sex.

- ➢ No feature of any of the policies or procedures documents I have reviewed facially denies the benefits to any person in the United States of any education program or activity at Virginia Tech (or elsewhere) on the basis of sex.

- ➢ No feature of any of the policies or procedures I have reviewed facially subjects any person in the United States to sex discrimination in any education program or activity.

- ➢ Virginia Tech policies and procedures are facially compliant with Title IX.

- ➢ At the time this matter arose, Virginia Tech had elaborate policies visibly designed to respond to both actual (and constructive) notice of gender-based violence and harassment and to sex/gender discrimination.

- ➢ I note that the Supreme Court has emphasized the need for recipient flexibility in its response obligations; as such there are no requirements emanating from the Supreme Court to have, or not have, a specific Title IX policy, or specific language in any policy. Virginia Tech's policies facially provide for prompt and equitable responses to actual and constructive notice of gender-based violence and harassment.

- ➢ At the time of this matter, the Department of Education had promulgated regulations and issued extensive *guidance* to the field in various documents, including in 2017 when that Department issued substantial and interim guidance, rescinding some guidance issued in the prior federal administration. The Department of Education consistently has been clear that guidance is *guidance*, not regulation—and guidance for administrative compliance purposes only. Reflecting the Supreme Court's direction to permit recipients flexibility the 2017 guidance directed the attention of institutions of higher education to *choices* regarding Title IX regulatory compliance.

- ➢ The Supreme Court standards for money damages in an implied cause of action under Title IX have remained static in Supreme Court jurisprudence to date; *administrative/regulatory* enforcement-related *guidance* and other interpretations have been complex and highly dynamic—even at times *inconsistent*—particularly since 2011. Nonetheless, at the time of this matter neither Title IX itself, the Supreme Court, then extant Title IX implementing regulations, nor even contemporaneous operative Title IX guidance mandated specific policy language or



- 6 -

> specific grievance procedures for recipients other than a required notice of non-discrimination (which is evident in the materials from Virginia Tech I have reviewed . . . .

- I draw attention to the following language of the implementing regulations contained in C.F.R. § 106, in effect at the time of this incident, which required institutions to 1) designate an employee responsible for Title IX compliance, 2) adopt procedures for Title IX grievances, and 3) disseminate a notice of nondiscrimination . . . . My review of the policy materials provided to me demonstrates that Virginia Tech policies facially complied with all of these regulatory requirements . . .  and in particular, facially articulated policies for "prompt and equitable" resolution of Title IX complaints . . . .

- In addition, although free to disregard prevailing "guidance" from the Department of Education, recipients have regularly evaluated such guidance for its utility in guiding those recipients in their compliance efforts, including policy development.

- Although technically Virginia Tech could not have been found to be in violation of Title IX for not following every feature articulated in this guidance, my review of the policy materials provided to me demonstrates that Virginia Tech, in its discretion, had incorporated each and every feature of this guidance . . . in its policies and procedures.

- I am familiar with industry behavior relating to Title IX compliance, including such behavior at the time of this matter. Recipients' Title IX policies typically contained common core features, which were influenced by other guidance promulgated by the Department of Education and the White House. Virginia Tech deployed Title IX policies and procedures consistent with such guidance.

- One resource that was influential to many recipients at the time of this matter was published by the White House Task Force to Protect Students from Sexual Assault in 2014. The task force provided a checklist of definitions for institutions for inclusion in campus sexual misconduct policies [including "domestic violence" and "dating violence"] . . . . In reviewing the Virginia Tech policies . . . Virginia Tech defined these terms in the *Policy on Harassment, Discrimination, Sexual Harassment* . . . and/or in the *Hokie Handbook*.

- Another document that was influential at the time was a 2014 guidance from the Department of Education, Office for Civil Rights. . . . In reviewing the Virginia Tech policies and procedures documents, Virginia Tech addressed each element in the *Policy on Harassment, Discrimination, Sexual Harassment* . . . the *Sexual Harassment and Sexual Violence Investigation Procedures* . . . and/or in the *Hokie Handbook*.

- The above paragraphs describe common features of Title IX policies in the higher education industry during the time of the incident at issue in this case, which are also features of Virginia Tech policies I have reviewed.



- 7 -

629.0344\NHS
4848-2093-8235 .v1

- ➢ Finally, I note that throughout the policy and procedures documents I reviewed, sex/gender-neutral language is used throughout. Nothing I reviewed state or suggested a bias for or against males or females, or otherwise on the basis of sex or gender.

- ➢ . . . in light of the evidence gathered by Virginia Tech, it might have been discriminatory on the basis of sex for Virginia Tech to have *not* found Doe in violation of Virginia Tech's Domestic Violence Policy, as to do so arguably might have constituted "deliberate indifference."

- ➢ . . . the Hearing Officers appear to have used their discretion to limit their finding to only a finding of responsibility under Virginia Tech's Domestic Violence policy. The documentation regarding Doe's adverse finding indicates that the Hearing Officers may have elected, for reasons other than the weight of the evidence, to not to have found Doe responsible for several policy violations for which he may have been responsible. In short, and colloquially speaking, Virginia Tech decision-makers may have "gone easy" on Doe, as other Hearing Officers might have exercised discretion to find Doe in violation of additional policies, potentially supporting additional sanctions.

- ➢ My review of the materials provided indicates that Virginia Tech's trained and experienced agents followed and impartially applied the facially non-discriminatory policies I reviewed in this matter. I detected no instances of bias against or in favor of any party or witness based on sex or gender. Indeed, if it were not for the use of pronouns referring to parties and witnesses, some specific references to genitalia as related to complaints lodged, and the unredacted use of names, I would not otherwise have been able to identify or speculate about the sex or gender of any party or witness from my review.

- ➢ These operatives attended trainings from vendors providing Title IX training at the time to the field, including ATIXA, NASPA, ASCA, Margolis Healy, and D. Stafford and Associates, among others. Nothing I have reviewed trained Virginia Tech Title IX operatives to act in any way with bias based on sex or gender.

- ➢ My review of the materials provided to me indicates that Doe and Roe were treated equitably in processing their complaints.

- ➢ There is nothing in the record I have reviewed that even suggests that Virginia Tech provided services or assistance in any differential manner on the basis of sex or gender in interacting with potential complainants.

- ➢ Also, based on my experience in the field, I observe that interim measures, such as no-contact orders, were and are routinely administered on college campuses unilaterally. There is no requirement that no-contact orders be administered *equally*. Indeed, the Department of Education has both acknowledged that this


FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 8 -

629.0344\NHS
4848-2093-8235 .v1

> practice is common and has recently articulated that unilateral no-contact orders can be equitable and need not be equal.

> My review of the materials provided to me also indicates that Doe and Roe were provided equal and ample opportunities to present evidence in support of their positions.

> The materials I have reviewed indicate the decisions regarding the gathering and presentation of information during the investigation and hearing processes were made in accordance with gender/sex neutral standards, including whether a witness could provide direct evidence relevant to a matter.

> My review of the materials provided to me indicates it was rational and reasonable for the Hearing Officers to have found Doe in violation of the Domestic Violence policy. . . . I further observe that it might have been erroneous if the Hearing Officers were to have *not* found Doe in violation of that policy, given the weight and gravitas of the inculpatory documentary evidence I have reviewed.

> My review of the materials provided to me indicates that it was rational and reasonable for the Hearing Officers to have found Roe in violation only of the Dating Violence policy as there was no "pattern" established for a possible violation of the Domestic Violence policy . . . .

> I note that neither the standard for Dating Violence nor Domestic Violence specifically refers to the other offense as a "greater" or "lesser" offense as such. However, the definition of Dating Violence "does not include" Domestic Violence as indicated above. This language, along with the fact that Domestic Violence is articulated as a "pattern of behavior" offense, suggests that Domestic Violence is the more serious offense.

> On appeal, the Hearing Officers offered elaborate and compelling justifications for the sanctions imposed against both Doe and Roe . . . .

> . . . the sanctions imposed were rational and reasonable in light of the materials I have reviewed. I also observe that, particularly in light of the Hearing Officers' concerns that Doe's behavior was accelerating and posed a risk to the community, the sanction actually imposed on Doe may have been lesser than that which the Hearing Officers' might have imposed; moreover, it might have been erroneous for the Hearing Officers to have imposed less than a two semester suspension on Doe.

> I want to state that under *Gebser* and *Davis*, there are no sentencing guidelines, nor are there under Title IX regulations. Also, equivalency in sanctioning is not required.



- 9 -

## IV. Lake's Opinions are Admissible

Doe contends that Lake's opinions are inadmissible legal opinions and run a substantial risk of confusing the jury. ECF No. 77, *4, *10. To the contrary, Lake's opinions are admissible and will be helpful to the jury in understanding the complex regime of Title IX regulation and guidance to universities as well as the training provided to administrators for handling Title IX investigations and adjudications. Lake has twice been recognized as qualified to testify as an expert in Title IX cases. Doe v. Rollins Coll., No. 6:18-cv-1069-Orl-37LRH, 2020 U.S. Dist. LEXIS 249436, at *1 (M.D. Fla. Jan. 7, 2020); Roohbakhsh v. Bd. of Trs. of the Neb. State Colls., No. 8:17CV31, 2019 U.S. Dist. LEXIS 190266, at *1 (D. Neb. Oct. 31, 2019).

While Doe accurately states the law that an expert generally may not give legal conclusions by applying law to facts, "expert testimony that ordinarily might be excluded on the ground that it gives legal conclusions may nonetheless be admitted in cases that involve highly technical legal issues." United States v. Offill, 666 F.3d 168, 175 (4th Cir. 2011) (citations omitted). While Doe relies on the "general rule" regarding opinions that potentially embrace an ultimate issue, "the far more complicated and measured question" is whether "there is a transgression of the rule." United States v. Perkins, 470 F.3d 150, 158 (4th Cir. 2006) (internal quotations omitted). This is not an easy task, and "[t]he rule makes ultra-fine distinctions." Id. Moreover, "[e]xpert or fact testimony on industry practice or standards . . . is often relevant and admissible." Roohbakhsh, 2019 U.S. Dist. LEXIS 190266, at *5–6(citing S. Pine Helicopters Inc. v. Phoenix Aviation Managers, Inc., 320 F.3d 838, 841 (8th Cir. 2003)). For example, the Fourth Circuit has approve the use of expert witnesses to testify regarding whether a party's actions were reasonable in light of



- 10 -

its obligations under the regulatory framework of the Fair Credit Reporting Act and the Food, Drug, and Cosmetic Act. See Daugherty v. Ocwen Loan Servicing, LLC, 701 F. App'x 246, 254–55 (4th Cir. 2017); United States v. Barile, 286 F.3d 749, 761 (4th Cir. 2002).

Indeed, multiple courts across the country have permitted experts in the field of Title IX compliance to testify at trial as to standards of care under Title IX, the history and purpose of Title IX and relevant industry practices and standards, and effective approaches to Title IX. See, e.g., Doe v. Rollins Coll., No. 6:18-cv-1069-Orl-37LRH, 2020 U.S. Dist. LEXIS 249436, at *1 (M.D. Fla. Jan. 7, 2020); Roohbakhsh, 2019 U.S. Dist. LEXIS 190266, at *1; Portz v. St. Cloud State Univ., 297 F. Supp. 3d 929, 953 (D. Minn. 2018); Doe v. Wharton Indep. Sch. Dist., No. 2:16-cv-48, 2017 U.S. Dist. LEXIS 33669, 2017 WL 932935, at *2 (S.D. Tex. Mar. 9, 2017). Such testimony clearly "assist[s] the jury." Offill, 666 F.3d at 175.

Additionally, there is no whole-sale ban on a qualified expert opining on whether a defendant complied with law and/or regulation. See, e.g., Cason v. C.R. Bard, Inc., No. 1:12cv1288, 2015 WL 9913809, at *12 (N.D. Ga. Feb. 9, 2015) ("Other courts have recognized that expert testimony on the reasonableness of a manufacturer's interaction with the FDA and compliance with FDA regulations would be helpful to the trier of fact from a regulatory perspective"); Tillman v. C.R. Bard, Inc., 96 F. Supp. 3d 1307, 1329 (M.D. Fla. 2015) ("[A] lay juror cannot be expected to understand the complex regulatory framework that informs the standard of care in the medical device industry"). Further, "an expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied." Burkhart v. Washington Metro. Area Transit Auth., 112 F.3d



629.0344\NHS
4848-2093-8235 .v1

1207, 1212–13 (D.C. Cir. 1997); <u>Torres v. Cnty. of Oakland</u>, 758 F.2d 176, 151 (6th Cir. 1985).

Virginia Tech has a qualified expert to rebut Doe's accusations that Virginia Tech's processes are inherently biased as well as to provide helpful background regarding educational institutions' practices for complying with Title IX, guidance from the Department of Education, and findings made by the Office for Civil Rights. Despite Doe's assertions to the contrary, it will be helpful to the jury to understand "the intricate system of federal regulations with which a school must abide" including the various guidance documents and documents rescinding prior guidance. As set forth above, Doe has alleged specific aspects of the Title IX investigation process and the Student Conduct process discriminated against him as a male. The processes are in place, however, in order to comply with regulatory requirements and guidance from the Department of Education.

Doe argues that Lake's opinions will confuse the jury because Lake relies on the "wrong legal standard" in forming his opinions. But Doe stretches Lake's report too far. The <u>Gebser</u> and <u>Davis</u> references are critical to establishing background and foundation for Lake's opinions regarding industry practices for compliance with Title IX, not the standard for Doe's claim in this Court. <u>See</u> Lake Dep., 37:14–38:16. Doe's argument misses the mark because Lake references this authority with respect to the policies and procedures in place at Virginia Tech and not in regards to Doe's burden of proof in this lawsuit. Moreover, Doe's contention that Lake's reference to the regulations promulgated by the Department of Education is "irrelevant to Doe's theory of liability" runs contrary to Doe's own allegations. As set forth above, Doe has put Virginia Tech's policies and procedures directly at issue by alleging that those policies and procedures in and of



- 12 -

629.0344\NHS
4848-2093-8235 .v1

themselves are biased against men. If Doe intends to present those allegations to a jury, then Virginia Tech is entitled to rebut them through the testimony of a qualified expert on Title IX operations such as Mr. Lake.

## CONCLUSION

For the foregoing reasons, defendant respectfully requests entry of an Order denying plaintiff's motion to exclude defendant's expert, Peter Lake, from testifying and granting such further relief as the Court deems just and proper.

Respectfully submitted,

VIRGINIA POLYTECHNIC INSTITUTE AND
STATE UNIVERSITY

By: /s/
Katherine C. Londos (VSB #: 36848)
Nathan H. Schnetzler (VSB #: 86437)
FRITH ANDERSON + PEAKE, P.C.
29 Franklin Road, SW
P.O. Box 1240
Roanoke, Virginia 24006-1240
Phone: 540/772-4600
Fax:    540/772-9167
Email: klondos@faplawfirm.com
          nschnetzler@faplawfirm.com

Kay Heidbreder (VSB No.: 22288)
University Legal Counsel and
Senior Assistant Attorney General
*heidbred@vt.edu*
M. Hudson McClanahan (VSB No.: 46363)
*hud3@vt.edu*
Kristina J. Hartman (VSB No.: 92279)
*kjhart06@vt.edu*
Stephen F. Capaldo (VSB No.: 74045)
*scapaldo@vt.edu*
Associate University Legal Counsel and
Assistant Attorney General
University Legal Counsel (0121)
Burruss Hall, Suite 236, Virginia Tech
800 Drillfield Drive



- 13 -

Blacksburg, VA  24060
Phone: (540) 231-6293
Fax: (540) 231-6474

*Counsel for Defendants*



629.0344\NHS
4848-2093-8235 .v1

**CERTIFICATE OF SERVICE**

      I hereby certify that on October 5, 2021, electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically send notification of such filing to all counsel of record.

/s/ _____
Of Counsel



- 15 -

629.0344\NHS
4848-2093-8235 .v1