IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JACOB DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:19-cv-00249 |
| | ) | |
| VIRGINIA POLYTECHNIC INSTITUTE | ) | By: Elizabeth K. Dillon |
| AND STATE UNIVERSITY, | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Jacob Doe sued Virginia Polytechnic Institute and State University (Virginia Tech) for discriminating against him on the basis of sex in violation of Title IX.  Doe and his ex-girlfriend, Jane Roe, brought Title IX complaints against each other in the wake of their breakup.  A Virginia Tech disciplinary board found both Doe and Roe responsible for misconduct; however, Doe received a harsher penalty than Roe.  The case is before the court on Virginia Tech's motion for judgment on the pleadings (Dkt. No. 79) considering the Fourth Circuit's decision in *Sheppard v. Visitors of Virginia State University*, which set out a new pleading standard for claims of sex bias in Title IX disciplinary proceedings.  993 F.3d 230 (4th Cir. 2021).  Virginia Tech also filed a motion for summary judgment (Dkt. No. 82).  The motions have been fully briefed and argued.  For the following reasons, the court will grant Virginia Tech's motion for summary judgment.[1]

---

[1] Given this ruling, plaintiff's motion in limine to exclude expert testimony (Dkt. No. 77) will be dismissed as moot.

## I.  BACKGROUND

Virginia Tech students Doe and Roe entered a romantic relationship in Spring 2017.  The two remained in a tumultuous relationship until December 4, 2017.  In the aftermath of their breakup, Roe obtained a protective order, initiated criminal proceedings, and filed a Title IX complaint against Doe.  In response, Doe threatened criminal proceedings and filed a Title IX complaint against Roe.[2]

### A.  Title IX Investigations

Some of the details of the couple's breakup on December 4 are disputed.  It is undisputed, however, that Doe approached Roe on campus, removed her headphones, called her vulgar names, requested she return his belongings, and that a bystander approached the couple to check on the situation.  Doe got in his truck and followed Roe back to her apartment.  At Roe's apartment, it is undisputed that the police were called, an emergency protective order was issued against Doe, and Doe was banned from Roe's apartment complex.  Subsequently, a temporary protective order was served on Doe.

Virginia Tech's Title IX office received a notification from the Blacksburg Police Department regarding the protective order.  Kelly Oaks, the Title IX Coordinator, asked Katie Polidoro, the Deputy Title IX Coordinator, to reach out to Roe about the incident.  Polidoro met with Roe at the Women's Center for Virginia Tech on December 15 to inform her about her rights and options to file a Title IX complaint.  Four days later, Polidoro and Roe met again, and Roe requested to file a formal complaint against Doe and gave a verbal statement in support.  The same day, Polidoro emailed Doe to inform him about the forthcoming investigation and to

---

[2]  Ultimately, Doe and Roe entered an accord and satisfaction in the criminal proceedings.  Pursuant to the accord and satisfaction, the charges against Doe were dropped, and Doe agreed not to bring charges against Roe.

set up a meeting to discuss the process.  Polidoro met with Doe the next day.  It is disputed what was said at the meeting—Doe contends that he was not given notice of all the allegations against him, only allegations relating to the December 4 incident and questions about his sex life.

Approximately three weeks later, Doe emailed Polidoro an eight-page statement responding to Roe's allegations and outlining their relationship.  In his statement, Doe detailed an incident that happened on his 21st birthday where Roe hit him repeatedly, slapped him across the face, and hit him in the face with a box of candy, leaving a cut and bruise under his eye.  Doe and Polidoro met a week later to discuss Doe's written statement.  Polidoro asked if Doe would like to file a complaint against Roe based on the content in his written statement.  The parties dispute Doe's answer to this inquiry.  Doe contends that he verbally informed Polidoro that he intended the written statement to serve as a basis for a complaint; however, Polidoro followed up by email eleven days later to see if Doe had "thought any more about filing a report."  Doe's response to that email stated in relevant part:

> My interest in describing my relationship with [her] was to defend my honor, and to show that after many discordant situations I never threatened or hurt [Roe] . . . .  As to her part in the relationship, I know that [] she violated the student code of conduct many times.  I will leave it up to you as to whether you choose to punish [her] for those violations.  If needed my statement can serve as a complain [sic] but I strongly feel that Virginia Tech should require her to get professional psychiatric help . . . .  As for what I think best serves my interests, I would like to put this case behind me . . . .  Legally [she] is not allowed to contact me.  As long as she lives up to that agreement I will be able to leave this in the past.

(Def's Ex. 24, Dkt. No. 83.)  Additionally, Doe requested that Polidoro interview his mother, his personal attorney, his roommate, a friend, and the commonwealth's attorney assigned to the criminal proceeding to "corroborate his statement."  (*Id.*)

3

Polidoro unsuccessfully tried to interview Doe's roommate and friend—his friend insisted that he did not want to be part of the investigation, and his roommate repeatedly failed to show up for scheduled meetings.[3]  Polidoro chose not to interview his mother and personal attorney because of a policy prohibiting interviews of personal advocates.  She chose not to interview the commonwealth's attorney because she believed the attorney did not have "direct knowledge" of the incident.  Doe insisted the commonwealth's attorney did have direct knowledge because he contended that Roe admitted to the commonwealth's attorney that she assaulted Doe.

After completing her investigation report regarding the allegations against Doe, Polidoro reached out to Doe again.  At that point Polidoro explained:

> Last month, when I asked if you would like to file a report against [Roe], you responded that you would leave that up to me.  The university initiates a complaint without complainant . . . in very limited circumstances.  After discussing this with [Kelly Oaks], we have determined that this case does not meet our criteria for doing so.  However, if you want to pursue a report against [Roe], you have the right to ask for that.  At this time, with the knowledge that the university will not be moving forward on a complaint against [Roe] unless you ask us to, I would like to hear from you if you would like to pursue a complaint using your statement as a report. Please let me know by . . . March 12, 2018 what you decide.

(Def's Ex. 25, Dkt. No. 83.)  Doe responded on March 13 asking to set up a meeting.  Polidoro interpreted this response as Doe not wanting to move forward with a complaint, instead focusing on academic support; however, Oaks disagreed with that interpretation of Doe's request.

Oaks reviewed Polidoro's investigation report against Doe and forwarded it to the Student Conduct office.  The student conduct case coordinator, Maya Azar, determined that Doe violated the student code of conduct and charged Doe with the following: Domestic Violence;

---

[3]  Both individuals were ultimately interviewed in the subsequent Title IX investigation brought against Roe.

Dating Violence; Damage or Destruction; Disorderly or Disruptive Conduct; Gender-Based

Stalking; Sexual Violence – Rape; and Unauthorized Entry.  Azar met with Doe on March 28 for

a pre-hearing informational meeting.

On March 30, Doe met with Polidoro and told her he would like to file a formal

complaint against Roe.  (Def's Ex. 37, Dkt. No. 83.)  On April 2, Doe provided another written

statement outlining his complaints against Roe.  (Def's Ex. 38, Dkt. No 83.)  At that point, the

scheduled hearing was postponed due to Doe's cross-complaint against Roe.  Polidoro opened an

investigation against Roe.  Doe provided a list of eight witnesses for the investigation; he again

included his mother, his personal attorney, and his friend.  (Def's Ex. 41, Dkt. No. 83.)  Polidoro

interviewed most of Doe's listed witnesses in addition to his roommate from his original list.

(Def's Ex. 19, Dkt. No. 83.)  Polidoro completed her investigation report on the allegations

against Roe on May 1, and it was forwarded to the Student Conduct Office the same day.  (*Id.*;

Def's Ex. 42, Dkt. No. 83.)  Roe was charged with the following:  Dating Violence, Domestic

Violence, Damage or Destruction, Sexual Violence–Rape, and Theft.

In anticipation of the hearing, Doe met with Azar again and received follow-up emails

reminding him that he could have witnesses participate in person, by phone, or by written

statement.  (Def's Ex. 43, Dkt. No. 83.)

**B.  The Disciplinary Hearing[4]**

The Student Conduct Office held a disciplinary hearing for both Doe and Roe's Title IX

complaints in May 2018.  The hearing lasted over four hours.   Kyle Rose and Ennis McCreary

---

[4]  Virginia Tech submitted audio of the disciplinary hearing as Exhibit 45.

were the hearing officers.  The officers opened the hearing by offering the parties an opportunity

to voice any concerns about the hearing officers' objectivity.  Neither party raised concerns.[5]

Both parties provided their own testimony and witness testimony and had the opportunity

to submit written questions, which were filtered for relevance by the hearing officers, to all

testifying parties.  The hearing officers also considered the Title IX investigation reports

prepared by Polidoro.

First, the hearing officers heard from Polidoro regarding her two investigations.  She

explained why she opted not to interview certain witnesses.[6]  She explained that Roe's complaint

alleged controlling behavior: Doe would complain about Roe's clothing choices, he would not

allow her to spend time with her friends and family, he yelled at her and used derogatory

language, he tracked her location on social media apps, and he hit walls and objects during

arguments.  Polidoro described Roe's characterization of the incident on December 4, 2017.

Polidoro then explained Doe's complaint against Roe: Roe, a black belt, physically abused Doe

many times during arguments and stalked him.  Polidoro described Doe's depiction of the

incident on his 21st birthday.  Polidoro noted the parties' responses to the complaints against

them—she specifically noted that Roe stated any physical harm inflicted on Doe was playful or

in self-defense.

Roe then gave her opening statement.  She described Doe's volatile behavior.  Her

description included many instances of Doe screaming, using derogatory language, including

"disgusting," "bitch," and "slut," and yanking her around.  She described Doe's controlling

---

[5]  Doe's exact response was "I've already expressed those to Steve in a letter, but nothing specific."  (Def's Ex. 45 6:40-7:28, Dkt. No. 83.)

[6]  Polidoro stated that she did not interview the commonwealth's attorney because she did not believe the attorney had "direct knowledge."  Similarly, Polidoro did not interview two of Roe's witnesses—university professors—because she did not believe they had "direct knowledge."

behavior—he tried to control her music, her clothing, and who she hung out with.  He did not

want her to have any male friends and assumed she was sleeping with any male she had contact

with.  He prevented her from taking a job because a past intimate partner worked there.  She

indicated that she regularly had bruising because of Doe yanking her around. She explained that

on Doe's 21st birthday, he backed her into a corner while screaming and spitting so she threw up

her hands in self-defense and her "finger scratched his eye."  She later stated that she never hit

Doe out of aggression; she only did it playfully.  Roe summed up her experience with Doe by

stating she was scared every time she walked through his apartment door.  She also described the

December 4 incident where Doe screamed, "ripped" out her headphones, and barged into her

apartment.

Roe provided three live witnesses and a written statement from another witness.  In

relevant part, Roe's witnesses described hearing Doe yell at Roe through her cell phone, hearing

him call her a "f****** bitch," seeing bruises on Roe, seeing him "pulling [her] around," and

seeing him smack her on the side hard enough to leave a bruise.  The investigation reports were

also part of the record.  The interviews in the investigation reports largely supported the

testimony provided at the hearing.

In his opening statement, Doe described Roe's abusive behavior.  He explained that at the

beginning of their relationship, Roe threatened him: If he ever broke up with her, she would burn

his truck to the ground.  Doe contended that Roe accused Doe of wanting to hook up with any

girl he had previously dated.  Further, she would not allow him to go to his fraternity when

certain girls were there because he "just wanted to f*** [them]."  Doe described multiple

physical assaults throughout the relationship, including multiple instances of slapping.  He stated

that the incident on his 21st birthday included accusations that he was hitting on other girls, hits

to the back of his head, a slap across the face, and being hit in the face with a box of candy that left a cut and bruise under his eye.  Doe also noted Roe frequently protested him watching porn.

Doe provided four witnesses.  His mother testified that Roe was controlling her son, noting that Roe would not allow Doe to interact with an ex-girlfriend that was a family friend. Doe's brother testified that when the couple would argue, Roe would smack Doe across the face. He described several "smacks," describing one as "hateful."  Doe's friend testified that on one occasion, he could hear Roe yelling at Doe inside Doe's apartment from the parking lot.  The friend testified that Roe called Doe a "f****** psycho" and that Doe could not hang out with this friend.  Finally, Doe's last witness was an ex-girlfriend who stated that she was under the impression that Roe did not allow Doe to talk to her.

The investigation reports supported the testimony at the hearing and added other details from witnesses who did not testify at the hearing but were interviewed separately.  Doe's roommate said he witnessed Roe slapping Doe in the face on the night of his 21st birthday.  One of Doe's friends said he vaguely remembered seeing Roe hit Doe on one occasion.  Doe's brother again noted several instances of Roe "smacking" Doe that was "over the line," including one instance of "even harder" smacking.  Further, Doe alleged that Roe looked through his phone and search history.  Doe also noted that on five or six occasions she bruised him on his abdomen to the point where he could not exercise.

Ultimately, Doe was found responsible for "domestic violence," and Roe was found responsible for "dating violence."[7]  (Def's Ex. 33, Dkt. No. 83.)  Both violations carried a

---

[7]  The Virginia Tech Policy on Harassment, Discrimination, and Sexual Assault defines the offenses as follows:

> **Dating Violence** – acts of physical or sexual abuse committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim.

> **Domestic Violence** – a pattern of abusive behavior that is used by an intimate partner to gain or maintain power and control over the other intimate partner.

recommended sanction of two semesters suspension.  (Def's Ex. 13, Dkt. No. 83.)  Kyle Rose, one of the hearing officers, testified that, in some cases, dating violence could be worse than domestic violence "depending on the intensity of the physical abuse."  (Rose Dep. 108:1–4, Def's Ex. 6, Dkt. No. 83.)  Doe received an above-range suspension of three semesters due to a "patterned behavior" of abuse that "escalated over the course of the relationship."[8]  (Def's Ex. 33 at 5, Dkt. No. 83.)  Roe received a below-range sanction of probation due to her status as a "victim of an abusive relationship" and a finding that she was "acting in self-defense" on the occasion she was found to have struck Doe.[9]  (*Id.* at 6–7.)  Doe and Roe were found not responsible on all other charges against them.  Both parties filed appeals, which were denied.

In their "Findings Rationale," the hearing officers "determined that [Doe] was responsible for a pattern of abuse throughout his relationship with [Roe]."  The hearing officers noted the repeated instances of yelling, Doe's disapproval of Roe's clothing choices, his disapproval of her communicating with past intimate partners, and his attempts to cut her off from friends and family.  The hearing officers relied on witness testimony to find that Doe yelled and used derogatory language and yanked Roe around.  They also credited four witnesses who

---

> Domestic violence can be physical, sexual, emotional, economic, or psychological actions or threats of actions that influence another person.  This includes any behaviors that intimidate, manipulate, humiliate, isolate, frighten, terrorize, coerce, threaten, blame, hurt, injure, or wound someone.

(Def's Ex. 1 at 4–5, Dkt. No. 83.)  The key differences in these definitions are that domestic violence requires a "pattern" of abuse "to gain or maintain power and control" and considers forms of abuse beyond physical and sexual abuse.

[8]  Doe's sanction also required him to "complete fifteen counseling sessions . . . submit 8 counseling logs, complete five emotion regulation worksheets, complete the anger management & relationship workbook, complete the MVP workbook, watch The Mask You Live In, and complete a reflection guide, schedule a mandatory assessment, and complete a re-enrollment interview."  (Def's Ex. 33 at 3, Dkt. No. 83.)

[9]  Roe's sanction also required her to "complete three counseling logs and schedule a follow-up meeting at the start of the Fall 2018 semester."  (Def's Ex. 33 at 6, Dkt. No. 83.)

reported seeing bruises on Roe. They noted the escalation in Doe's behavior throughout the relationship culminating in the December 4 incident.  To conclude, the hearing officers explained,

> In addition to [Roe's] account, multiple witnesses report important details from different points throughout their relationship that validate [Roe's] perspective.  Though [Doe] offered witnesses as well, none of them diminished the believability of [Roe] and the witnesses who corroborated her, with any credibility.

(*Id.*)  In their "Sanctions Rationale," the hearing officers justified Doe's aggravated sanction by noting a "patterned behavior" of abuse that "escalated over the course of the relationship."  (*Id.*)

The hearing officers found Roe responsible for dating violence and sanctioned her with probation.  In their "Findings Rationale," the hearing officers only credited Roe with violence during the incident on Doe's 21st birthday.  They noted that Doe testified that Roe slapped him, which was confirmed by a witness in the investigation report.  Further, another witness observed the cut beneath Doe's eye, but the hearing officers credited Roe's statement that any violence was in self-defense.  In finding Roe not responsible for domestic violence, the hearing officers noted "they were unable to determine that there was a pattern of abusive behavior…to maintain power or control over [Doe]."  In their "Sanctions Rationale," the hearing officers justified a mitigated sanction by noting that Roe was "the victim of an abusive relationship" and was "acting in self-defense" when she struck Doe on his 21st birthday.

**D. Trainings and Culture Around Intimate Violence at Virginia Tech**

In his opposition to Virginia Tech's motion for summary judgment, Doe cites several articles, trainings, statistics, and other materials that he believes show that Virginia Tech and its employees see female students as victims and male students as perpetrators.  (Mem. Opp. to Mot. for Summ. J. 2, Dkt. No. 90.)

Doe contends that Virginia Tech responded to the "Dear Colleague Letter" issued by the Department of Education Office for Civil Rights in 2011 in a manner that weakened protections for accused students.  In several exhibits, Doe provides slides from trainings administered by an outside group that he contends show sex bias by using examples that focus on female victims. Virginia Tech concedes that one of the trainings was conducted in 2015, but the other was conducted during the 2018–2019 academic year, after the hearing in this case.  Doe also mentions that Virginia Tech trains its employees to use a "trauma-informed" investigation approach that prejudices accused students.  Finally, Doe cites an article received by Kelly Oaks and an article written by Frank Shushok, Jr., then the Title IX coordinator, as evidence of Virginia Tech fostering an environment of sex bias.

## II.  DISCUSSION

### A.  Virginia Tech's Motion for Judgment on the Pleadings

Virginia Tech moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  (Mot. for J. on Pleadings, Dkt. No. 79.)  Motions for judgment on the pleadings are "governed by the same standard as motions brought under Rule 12(b)(6)."  *Massey v. Ojaniit*, 759 F.3d 343, 347 (4th Cir. 2014).  To survive a motion for judgment on the pleadings, a complaint must "contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

As the basis for its motion, Virginia Tech argues that the complaint fails to satisfy the pleading standard for Title IX claims in the context of higher-education disciplinary proceedings set forth in the Fourth Circuit's recent *Sheppard* decision.  In *Sheppard*, the Fourth Circuit, as a matter of first impression, determined what a party asserting a Title IX claim in the context of a higher-education disciplinary proceedings must plausibly allege.  993 F.3d at 235.  The court

noted the split between the eight circuits that had addressed the issue. *Id.* at 235–236. Ultimately, the Fourth Circuit adopted the simpler of the two approaches, set out by the Seventh Circuit: Do the alleged facts, if true, raise a plausible inference that the university discriminated against the student on the basis of sex? *Id.* at 236. The court noted that this standard is more consistent with the text of Title IX, which "prohibits all discrimination on the basis of sex." *Id.*

The *Sheppard* court qualified its adoption of the Seventh Circuit approach in two ways. First, the court found no inherent problem with the "erroneous outcome" or "selective enforcement" theories set out by the Second Circuit in *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994). Rather, those theories are possible means to the end of pleading sufficient facts to state a plausible claim. *Id.* Second, the court found that a plaintiff must adequately plead but-for causation. *Id.* By adopting a but-for causation requirement, the court rejected a suggestion by the Seventh Circuit that it might be sufficient for sex to have merely been "a motivating factor" of the disciplinary treatment. *Id.* at 236 n.7.

Virginia Tech argues that Doe alleged in his complaint "that the finding against him was 'motivated' by sex bias," and, thus, "his claim is fatally flawed and must be dismissed." (Dkt. No. 80 at 2 (citing Compl. ¶ 91, Dkt. No. 1).) Virginia Tech contends that the pleaded allegations cannot show "that 'but-for' sex bias Doe was erroneously found responsible for a violation of the Student Code of Conduct." Its briefing claims that "only one allegation relates to the finding against [Doe]: Doe's claim that Virginia Tech prevented him from presenting evidence that supported his position. The others relate to Doe's charges against Roe, not the alleged erroneous outcome as to Doe." (Dkt. No. 80 at 4.)

Doe argues that not only does Virginia Tech misread his complaint, but it also misreads the Fourth Circuit's decision in *Sheppard*. First, Doe asserts that the complaint's allegations that

12

the "erroneous[] finding" and "disproportionate sanction," "[were] motivated by sex bias" is different than alleging sex bias was merely a motivating factor.  (Dkt. No. 91 at 4 (citing Compl. ¶ 91).)  Second, Doe argues that *Sheppard* foreclosed allegations that sex bias was "a motivating factor" in the action but not that the action was "motivated by" sex bias.  Further, Doe argues that Virginia Tech's reading of *Sheppard* seems to require strict pleading of but-for causal language, ignoring that the standard is actually "facts sufficient to raise a plausible inference that the discipline was caused by sex."  Doe argues strictly requiring but-for causal language leads to mere "formulaic recitation" admonished in *Bell Atlantic Corp. v. Twombly*.  550 U.S. 544, 555 (2007).

      The court agrees with Doe.  It is sufficient that the allegations raise a plausible inference that sex bias is a but-for cause of discriminatory treatment in the disciplinary proceedings.  The court is satisfied with Doe's allegation that Virginia Tech's treatment was "motivated by" sex bias.  Therefore, the court will deny Virginia Tech's motion for judgment on the pleadings.

## B. Virginia Tech's Motion for Summary Judgment

      Under Federal Rule of Civil Procedure 56(a), summary judgment should be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it could determine the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986); *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).  And it is the burden of the moving party to show the absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  After this showing has been made, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Fed. Rule Civ. Proc. 56(e)).

If the nonmoving party is unable to provide facts that show a genuine issue for trial, then the granting of summary judgment is proper.  Fed. R. Civ. P. 56(e)(3).

When considering a motion for summary judgment, the court does not "weigh the evidence"; instead, the court determines whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248-250.  For this determination, the evidence, inferences, and arguments of the case are considered in the most positive light for the nonmoving party.  *Martin v. Duffy*, 977 F.3d 294, 298 (4th Cir. 2020).

Virginia Tech moves for summary judgment on Doe's Title IX claim.  In its motion, Virginia Tech pigeonholes Doe's claim: "Doe has made clear, time and again, that he is pursuing a claim under Title IX pursuant to an 'erroneous outcome theory.'"  (Mem. in Supp. of Mot. for Summ. J. at 19, Dkt. No. 83 (citing Dkt. Nos. 32, 54).  However, in light of *Sheppard*, the court will not funnel Doe's allegations into an erroneous outcome or selective enforcement theory.[10]

As a threshold matter, the court finds, in light of *Sheppard*, that the appropriate standard on summary judgment is:

> Could a reasonable jury, viewing the evidence in the record in a light most favorable to Doe, find that sex was a but-for cause of Virginia Tech's disciplinary decision?[11]

---

[10] Supporting Virginia Tech's position, in a recent case, the Northern District of Alabama adopted *Sheppard*, but because the plaintiff framed his complaint and opposition arguments under the *Yusuf* theories, the court analyzed the allegations under those theories.  *See Doe v. Samford University*, Case No. 2:21-cv-00871, 2021 WL 3617702, at *7–10 (N.D. Ala. Aug. 15, 2021).  However, the court noted that the plaintiff  expressly "ask[ed] the court to analyze his claims under [the *Yusuf*] theories."  *Id.* at *7.  That is not the case here.

[11] The parties dispute whether sex must be "a" but-for cause or "the" but-for cause of the disciplinary decision.  The court finds that sex must be "a" but-for cause, not "the" but-for cause.  While the *Sheppard* court concluded that "there is no plausible inference that [plaintiff's] gender was *the* "but-for" cause of his treatment," it cited to *Bostock v. Clayton County, Georgia*, 149 S. Ct. 1731 (2020) for "the 'simple' and 'traditional' standard of but-for causation."  993 F.3d  230, 236 (4th Cir. 2021) (emphasis added).  In *Bostock*, a Title VII case, the Supreme Court explained "[o]ften, events have multiple but-for causes….So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law."  149 S. Ct. 1731, 1739 (2020).

Virginia Tech argues no reasonable jury could find that Doe was discriminated against on the basis of his sex because there was ample evidence to justify the hearing panel's finding and sanction, no procedural irregularities, and no general environment of bias against males.  Further, Virginia Tech argues that no reasonable jury could find that Doe's sex was a but-for cause of any discrimination.

Without direct evidence of discrimination, Doe relies on three types of circumstantial evidence.  He relies on generalized evidence of an environment biased against males at Virginia Tech, specific procedural irregularities in his case, and the findings of fact, decision, and sanction in his case, which he contends were against the weight of the evidence.  Doe terms this "top-to-bottom bias" by Virginia Tech.  Courts have held that "generalized evidence, standing alone, cannot satisfy a Title IX plaintiff's summary judgment burden."  *Doe v. Univ. of Denver*, 1 F.4th 822, 831 (10th Cir. 2021).  Rather, generalized evidence must be supported with particularized evidence "that would indicate that [the university's] decision in [plaintiff's] particular case was based on [sex]."  *Id.*; *see also, Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018).  Likewise, it seems clear that a plaintiff cannot rely solely on the fact that the factfinders credited one party's witnesses and not the other party's witnesses.  Doe conceded as much at the hearing on this motion.  The court will take each of type of circumstantial evidence in turn, but ultimately considers the totality of the circumstances.[12]  *Doe v. Univ. of S. Indiana*, No. 22-1864, 2022 WL 3152596, at *4 (7th Cir. Aug. 8, 2022) (noting that "the ultimate inquiry must consider the totality of the circumstances").

---

[12] Courts have applied the familiar *McDonnell Douglas* burden-shifting framework in Title IX sex discrimination cases.  *See, e.g., Doe v. University of Denver*, 1 F.4th 822, 831–35 (10th Cir. 2021).  The parties did not present their arguments in terms of the *McDonnell Douglas* framework, so the court does not explicitly address the framework.  However, the analysis that follows is effectively addressing step one of the three-part burden-shifting framework.

### 1.  General Environment of Sex Bias at Virginia Tech

Doe relies on a number of articles, trainings, statistics, and other materials to show that Virginia Tech created a general environment of bias against males in disciplinary proceedings.

First, Doe makes reference to the 2011 Dear Colleague Letter issued by the Department of Education's Office of Civil Rights.  The letter "instructed universities on how to investigate and resolve complaints of sexual misconduct under Title IX."  *Doe v. Samford Univ.*, 29 F.4th 675, 691 (11th Cir. 2022).  Doe argues this letter "encouraged universities to weaken procedural protections for accused students."  (Dkt. No. 90 at 5.)  However, the Dear Colleague Letter was rescinded prior to Doe's disciplinary proceeding.  *See Samford Univ.*, 29 F.4th at 691 ("[Plaintiff's] allegations about a government policy that has been rescinded and replaced do not assist him in crossing 'the line between possibility and plausibility of entitlement to relief.'") Additionally, even if the court considers the letter, it was about procedural protections for *accused* students, which does not lead to an inference of anti-male bias.

The same can be said about Doe's argument regarding trainings in a "trauma-informed approach."  (*See* Dkt. No. 90 at 18–19.)  Doe argues that this type of training "essentially teaches Virginia Tech employees to believe women, even when there are problems with their stories." However, nowhere is it shown that this approach is geared to the sexes rather than to the accuser. Again, taking this argument for granted, it would support an accusation that the university might be biased against accused students, which in this case were both Doe and Roe.

Doe also points to a series of trainings given to Virginia Tech employees, which he argues are "littered with indications of sex bias, including through the use of examples of harassment, and reliance on statistics almost exclusively feature male perpetrators."  There are many issues with Doe's reliance on the trainings he included in the record.  First, some of the

trainings he included were conducted after he was sanctioned, which makes them irrelevant. Second, his statement that "*in every example statement* [in one training], the perpetrator was a male," is false.  For example, the training he cites for that proposition includes examples like, "I was just playing when I touched his penis," and "He should have realized she meant it as a compliment."  (Dkt. No. 90-3.)  Another training cites a statistic on how often undergraduate males are "victims of attempted or actual sexual assault."  (Dkt. No. 90-15.)  Still more trainings use inclusive pronouns when talking about who might be an alleged victim of sexual assault.  (Dkt. No. 90-19 ("realize that *he or she* is coming to you for help and may have had a traumatic experience"; "us[e] gender-neutral speech where appropriate") (emphasis added).)  Even if there is a disparity in illustrating alleged sexual assault victims as females, Doe admits that "the vast majority of alleged victims of sexual assault are women, with male perpetrators…."[13]  (Dkt. No. 90 at 19.)

Finally, Doe argues that an article written in April 2017 by then-Title IX Coordinator, Frank Shushok, Jr., demonstrates bias against males.  (Dkt. No. 90-17).  Doe argues that the article, titled "I had no idea: Sexual assault awareness begins on campuses," supports his contention that "Virginia Tech administrators fostered a believe-all-women narrative."  (Dkt. No. 90 at 17.)  Doe argues that the article cites "a widely criticized statistic that one in five women are victims of sexual assault on college campus[es]," but Doe provides no further basis to show that the statistic is false or inaccurate.  Doe also does not mention that in the same sentence, Shushok mentions that "one in 16 men are sexually assaulted in college."  Throughout the

---

[13]  Doe also points to an article that Kelly Oaks received as part of a listserv from a third-party organization.  The article is titled, "Why is Fraternity Membership Associated With Sexual Assault?  Exploring the Roles of Conformity to Masculine Norms, Pressure to Uphold Masculinity, and Objectification of Women."  There is no evidence that Oaks read the article or that it was read by other employees.  Even assuming the article is relevant, it provides another basis for discrimination—fraternity membership.

article, Shushok uses neutral language—including references to "students."  The article is clearly insufficient to raise an inference that Shushok "fostered a believe-all-women narrative" within the Title IX office at Virginia Tech.

The deficiencies in Doe's generalized evidence are best elucidated by comparing it to cases where courts did credit generalized evidence.  In other cases, plaintiffs have supported an inference of sex bias by showing that a particular university was under active investigation by the Office of Civil Rights while the plaintiff's disciplinary hearing was ongoing; that the university was facing an active, highly publicized lawsuit by a female athlete; or a state legislature had launched an investigation against the university.  *See Baum*, 903 F.3d at 586; *Doe v. University of Arkansas-Fayetteville*, 974 F.3d 858, 865 (8th Cir. 2020); *Doe v. Purdue University*, 928 F.3d 652, 668 (7th Cir. 2019).    In those cases, the "pressure on the university…was far from abstract."  *Purdue University*, 928 F.3d at 668.  In sum, the generalized evidence put forward by Doe is not sufficient to show an environment of discrimination against males at Virginia Tech.

### 2. Virginia Tech's Investigation Process

Evidence of "clear procedural irregularities" can support a case of sex bias.  *See, e.g., Doe v. Oberlin College*, 963 F.3d 580, 586–88 (6th Cir. 2020).  "[I]f procedural irregularities are sufficiently numerous, lopsided, and/or important, they can sometimes support an inference of sex discrimination."  *Univ. of S. Indiana*, 2022 WL 3152596, at *5.  Doe argues that his case was rife with procedural irregularities throughout the investigative process.  However, in this case, it is clear there were not procedural irregularities; in fact, the record shows that Virginia Tech took pains to ensure Doe was treated fairly.

First, Doe argues that Polidoro proactively reached out to Roe to initiate a complaint against Doe but failed to proactively initiate a complaint against Roe based on Doe's initial written statement.  Doe argues that this was Polidoro "acting as an advocate for Roe, and as a prosecutor against Doe."  The record shows this argument is unfounded.

Polidoro did not reach out to Roe on her own volition; rather, the Title IX office received notice from the Blacksburg Police Department that Roe had received a protective order against Doe.  The Title IX office did not act *sua sponte*.  The office responded pursuant to policy and as it would if it received a report from a reporting employee.  As to Doe's complaint against Roe, Doe was repeatedly vague and ambiguous about his desire to pursue a formal complaint against Roe.  Despite this lack of clarity, Polidoro followed up with Doe multiple times informing him that he needed to file a formal complaint to initiate an investigation and asking him if he wished to do so.  All of this was consistent with Virginia Tech policy that prioritizes giving a student autonomy over whether to go forward with a claim.  In reality, Doe is asserting that he should have received the special privilege of having the Title IX office initiate a complaint on his behalf.  Once Doe unequivocally filed a formal complaint, his allegations were investigated fully and forwarded to the Student Conduct Office.

Second, Doe questions the interviewing process conducted by Polidoro.  These objections are also not well taken.  A couple of Doe's witnesses *chose* not to participate in the initial investigation against Doe.  Even so, these witnesses were interviewed in the subsequent investigation against Roe, and their testimony was before the hearing officers at the disciplinary hearing.  Additionally, Polidoro followed policy when she did not interview individuals designated as advocates or individuals that she believed did not have "direct knowledge."  At the time Doe requested Polidoro interview his mother, she was acting as his advocate.  After Doe's

mother withdrew from her role as advocate, she provided live testimony at the disciplinary

hearing.  Polidoro also even handedly applied the policy requiring an individual to have "direct

knowledge."  She chose not to interview four people due to a lack of "direct knowledge"—two

offered by Doe and two offered by Roe.[14]  Further, Doe was reminded that he could offer

evidence, live or written, at the hearing.

There is also evidence that Doe's allegations were taken seriously and investigated.  The

disciplinary hearing was postponed once Doe submitted his formal complaint against Roe.  The

Student Conduct Office reviewed the investigation report and charged Roe with five separate

offenses.

The record is clear that there were not procedural irregularities in this case that raise a

specter of sex bias.  Regarding almost every procedural issue, Doe was provided the proper

process.

### 3. The Disciplinary Hearing Findings and Sanctions

Some courts have found that the merits of a decision itself can support a claim of sex bias

"when the degree of doubt . . . passes from articulable to grave," or when an outcome was

against the "substantial weight of the evidence."  *See Oberlin*, 963 F.3d at 588; *University of*

*Arkansas-Fayetteville*, 974 F.3d at 865.  Doe argues that the hearing officers' findings and

sanctions in his case are evidence of sex bias.  After a four-hour hearing, the disciplinary hearing

panel found Doe responsible of Domestic Violence and Roe responsible for Dating Violence.

The baseline sanctions for these charges were the same; however, Doe received an aggravated

sanction while Roe received a mitigated sanction.

---

[14] Doe protested that the commonwealth's attorney did in fact have direct knowledge of the incident
because Roe admitted to physically abusing him.  While Polidoro may have been mistaken in not interviewing the
commonwealth's attorney on this basis, there is no evidence that this was due to sex bias rather than just a
misunderstanding of what knowledge the commonwealth's attorney possessed.

As an initial matter, it is not this court's responsibility to "step into the shoes of the university's decision-makers and evaluate the weight and credibility of the evidence [Virginia Tech] found demonstrated [Doe] was responsible for misconduct." *Rossley v. Drake University*, 342 F. Supp. 3d 904, 927 (S.D. Iowa 2018); *see also Doe v. University of the South*, 687 F. Supp. 2d 744, 755 (E.D. Tenn. 2009); *Yu v. Vassar College*, 97 F. Supp. 3d 448, 461 (S.D.N.Y. 2015). As one court aptly analogized, "trials in civil courts sometimes produce erroneous outcomes as well as procedural errors.  Appellate courts do not quickly infer that an erroneous result must have been caused by unlawful bias, especially in difficult credibility contests." *Univ. of S. Indiana*, 2022 WL 3152596, at *10.  It is not for this court to retry the disciplinary hearing.

In the court's view, there is no dispute that there was sufficient evidence in front of the disciplinary hearing officers to reasonably find Doe responsible for domestic violence. *Id.* ("On the record before us, the committee's choice to credit Jane's account over John's appears reasonable and falls well short of proof that the committee was biased against men.")  That is, the evidence in front of the officers could support a finding by a preponderance of the evidence of "a pattern of abusive behavior that is used by an intimate partner to gain or maintain power and control over the other intimate partner."  This was not a case where the hearing officers "accept[ed] an unsupported accusatory version over that of the accused."  *See Menaker v. Hofstra University*, 935 F.3d 20, 34 (2d Cir. 2019).  Roe's allegations regarding domestic violence were corroborated by other witnesses' testimony and other evidence.  There was corroboration of physical, mental, and psychological abuse by Doe.  It is not for this court to determine whether Doe's witnesses "diminished the believability of [Roe] and [her] witnesses."  The hearing panel chose to credit Roe and her witnesses as to Roe's allegations against Doe.

But to be sure, the hearing officers did not accept all of Roe's allegations.  For example, Doe and Roe were both charged with "Sexual Violence–Rape" and "Damage or Destruction." As to these charges, the evidence was largely Roe's testimony versus Doe's testimony, but the hearing officers found neither party responsible on either charge.  In finding Doe "not responsible" for sexual violence, the hearing panel explained:

> [Roe] stated that [Doe] had engaged in sexual activity with her on numerous occasions without her consent, including when she was asleep.  [Doe] stated that these incidents did not occur.  Based on the information provided, the hearing officers were unable to find…[Doe] responsible for violating the Sexual Violence–Rape policy.

The court also believes that there was sufficient evidence in front of the hearing officers to support an aggravated sanction for Doe.  There was evidence of physical abuse that led to bruising, vulgar name calling, disorderly and disruptive conduct, including Doe's public behavior when the couple broke up, among other evidence.  The hearing officers looked to other domestic violence findings as precedent for Doe's sanction, noting his "escalat[ing]" pattern of abuse and public display of verbal and physical abuse were aggravating factors.

It seems that Doe's real contention is that this court should find that Roe was guilty of domestic violence and should have received a harsher sanction.  But again, that is not for this court to decide.  In the appeal responses, the hearing officers explained that they did not ignore the evidence Doe produced against Roe.  Rather, they chose not to credit the evidence, and they provided explanations why.  For example, the hearing officers explained that they chose not to credit two of Doe's witnesses because they were family members *and* because their statements directly contradicted other witnesses, including "in some cases, [Doe] himself."  Further, there was evidence in the record that some of Doe's other witnesses corroborated Roe's allegations or contradicted Doe's account of events.  For example, one of Doe's roommates explained how Doe

would "end up screaming [at Roe]" and during arguments Roe's voice was nowhere "near as loud as [Doe's]." "[Doe] was just way louder." During the incident on Doe's birthday, Doe said that his roommate "was alarmed at the cut under my eye," but the roommate stated that the "scratch" was on Doe's abdomen and that the events happened in a different order.[15] Doe also said his roommate was a witness to other acts of violence and saw bruises on Doe, but the roommate stated that "[h]e could not recall other times when he saw [Roe] physically hurt [Doe]," and that he never saw Doe with injuries "aside from the night of his birthday." Again, this is not the court weighing the evidence for an ultimate decision; it is only to illustrate that there was plenty of evidence for the hearing panel to discredit certain witnesses unrelated to their proponent's sex.

On the record before the court, the hearing officers' findings of fact, decision, and sanctions, including their decision to credit certain witnesses and not others, were "reasonable and fall[] well short of proof that the [hearing officers were] biased against men." *Univ. of Southern Indiana*, 2022 WL 3152596, at *10.

*** 

To conclude, the record does not show a general environment at Virginia Tech biased against males; the record does not show procedural irregularities in Doe's case; and the findings of fact, the decision, and the sanctions were reasonable and supported by sufficient evidence. Thus, the court finds that no reasonable jury could find that Virginia Tech's disciplinary decision in Doe's case was caused by his sex.

---

[15] Notably, these inconsistences also provide a basis for why the hearing panel seemed to credit Roe's account of the birthday incident despite finding her responsible for it.

III.  CONCLUSION

For the reasons stated herein, the court will issue an appropriate order denying the motion for judgment on the pleadings, granting the motion for summary judgment, and dismissing as moot the motion in limine to exclude expert witness testimony.

Entered: August 11, 2022.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge